UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SYNA THY,

                Plaintiff,

        v.

CAROLYN W. COLVIN,

                Defendant.

Case No.  16-cv-03127-WHO

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 14, 19

        The parties cross-move for summary judgment in this Social Security appeal.  I find that the ALJ failed to develop the administrative record in not determining whether records relating to plaintiff Syna Thy's prior claim existed and erred in rejecting the opinions of Thy's treating medical sources and her testimony for reasons unsupported by the record.  Accordingly,  I GRANT plaintiff's motion, DENY defendant the Commissioner of the Social Security Administration's motion, and REMAND for further proceedings consistent with this Order.

**BACKGROUND**

**I.      PROCEDURAL HISTORY**

        The procedural history of this case is complex.  In 1993, Thy applied for Title XVI Supplemental Security Income ("SSI") benefits, alleging an onset of disability of January 28, 1992 based on Post-Traumatic Stress Disorder and arthralgia.  AR 13, 426.  Her claim was denied on October 4, 1995 at the hearing level, and the Appeals Council denied review on November 15, 1996.  AR 426.  According to the SSA, ALJ John J. McCarrick denied the claim, concluding that Thy's impairments were not severe because she lacked credibility.  AR 13, 426.  The records relating to Thy's prior claim, including ALJ McCarrick's unfavorable decision, are not part of this record.  They were requested by a medical examiner (Dr. Lee) but he was not able to secure them. AR 602, 604.

On September 8, 2005, Thy filed applications for Title II Social Security Disability Insurance ("SSDI") and Title XVI Supplemental Security Income ("SSI") benefits. Administrative Record ("AR") 88-89. Both applications alleged an onset of disability on March 15, 2002, based on Anxiety Disorders, specifically Post-Traumatic Stress Disorder ("PTSD"). AR 88-89, 426-27. The Disability Determination Service ("DDS") initially approved both applications on March 28, 2006, and noted in the Remarks section of the Disability Determination and Transmittal Forms that Thy "may be able to handle own funds in a few months after group therapy when her depression isn't so crippling, per Lana Lechabrier, MD." AR 88-89, 418.

But on April 11, 2006, Agency medical consultant Herbert Ochitill completed a Review of Mental Residual Functional Capacity Assessment form and a Review of Psychiatric Review Technique form, and indicated on both documents that "ME needed to clarify severity of impairment." AR 435-38. Ochitill's recommendations were "[s]uggest the DDS attempt to obtain documentation of the [claimant's] alleged 'multiple suicide attempts' in '02 to confirm the [claimant's] assertion of a traumatic event and her psychological response to such an event. Up-to-date [outpatient] treatment records from Alameda Co. could clarify the ongoing severity of the [claimant's] impairment." AR 434.

In a form titled "Request for Corrective Action,"[1] Agency medical reviewer J. Ho noted that the DDS made its initial disability determination—"assess[ing] a current mental RFC for inability to adapt successfully to the normal mental demands of competitive and unskilled labor with an EOD of 3/15/02"—without considering the prior decision of ALJ McCarrick under the Ninth Circuit's *Chavez* ruling. AR 426-27 ("[T]he DDS must consider the impact of the prior ALJ decision under the Chavez AR."). The reviewer concluded that "[o]ur review of the file indicates that it does not contain enough information to determine the appropriateness of this decision," and "[c]urrent treatment records from her TS (i.e., Asian Community Mental Health Services) are also needed to clarify ongoing severity of the claimant's impairments." AR 427. The reviewer also

---

[1] This form is not dated and the list of exhibits from the ALJ hearing (identifying each document's source, date, etc.) does not specify its source or date. AR 32. Presumably, this document was completed following Ochitill's April 11, 2006 review.

noted that "the claimant is not fully credible since she is still alleging an inability to speak, read and write English, which the ALJ found to be misrepresented." AR 427.[2] The March 28, 2006 Disability Determination and Transmittal Forms in Thy's file were crossed out, and new Disability Determination Forms, dated August 3, 2006, were added. AR 89-90. The new forms indicate that Thy was not disabled, and note in the Remarks section that the *Chavez* standard was considered. AR 87-90. Yet, despite the DDS' updated finding of no disability, the SSA continued paying Thy Title XVI benefits through at least October 2015. AR 13, 120, 410.

On October 29, 2012, the SSA District Office realized that Thy never "had a medical allowance" and was mistakenly placed in pay status. AR 117. At the District Office's request, the DDS was asked to "develop" Thy's case and make "a new medical decision." *Id.* That new medical decision was that Thy was no longer disabled as of July 1, 2013. AR 117. On July 18, 2013, the SSA sent Thy a Notice of Disability Cessation explaining that her SSI payments would stop in September 2013 because "medical evidence shows that your health improved in July 2013 and you are now able to work." AR 91, 97-99. Thy submitted a timely request for reconsideration and testified before a Disability Hearing Officer ("DHO") on January 16, 2014. AR 100-112. In a decision dated April 2, 2014, the DHO noted that there was "no evidence of significant credibility issue(s) within [Thy's] testimony," but found that Thy did not meet the criteria for disability under the SSA.[3] AR 113-126.

On April 8, 2014, Thy filed a written request for an ALJ hearing, and a hearing was set for August 19, 2015. AR 130-33, 170. On July 21, 2015 and August 11, 2015, respectively, Thy's attorney requested in writing that an endocrinologist and a psychological expert be present at the hearing to provide opinion testimony regarding Thy's medical records and diagnoses. 408-09.

---

[2] Meanwhile, the SSA sent Thy a Notice of Award dated June 16, 2006 to notify her that she was eligible for SSI disability benefits beginning December 2005. AR 13.

[3] The DHO also concluded that based on the District Office's error, Group I exceptions to the medical improvement review standards ("MIRS") applied. AR 113, 126. Group I exceptions apply in "certain limited situations when your disability can be found to have ended even though medical improvement has not occurred, if you can engage in substantial gainful activity," including when substantial evidence demonstrates that a prior disability determination was in error. *See* 20 C.F.R. § 404.1594.

3

The hearing was held before ALJ Richard Laverdure on August 19, 2015, in Oakland, California. *See* AR 44. Thy testified through a Cambodian interpreter, and the ALJ also heard testimony from impartial medical expert and board certified internist Kweli J. Amusa, M.D., and impartial vocational expert Joel M. Greenberg, M.S. *See* AR 44. Thy was representing at the hearing by her attorney.

At the hearing, ALJ Laverdure noted that there was no medical evidence in the record pre-dating 2011, and agreed to keep the record open for one week so that Thy's attorney could attempt to get additional medical records from Thy's providers. AR 50, 84-85. Thy's attorney subsequently obtained and submitted to the ALJ approximately 160 pages of additional medical records relating to Thy's treatment by her mental health providers between September 2013 and August 2015 (*see* AR 825-889), and her primary care providers between November 2005 and May 2012 (*see* AR 890-987). AR 417, 420, 422, 424.

On October 29, 2015, ALJ Laverdure issued an unfavorable decision, finding that Thy was not under a disability as defined by the SSA since September 8, 2005 (the date Thy filed her second applications for disability benefits) or since July 1, 2013 (the date that the DDS determined that Thy was no longer disabled, following the request for corrective action). AR 13-27. The Appeals Council denied Thy's request for review on April 4, 2016. AR 1-4. Thy filed this action on June 8, 2016. Currently before me is Thy's motion for summary judgment (Dkt. No. 14) and the government's cross-motion for summary judgment (Dkt. No. 19).

## II.     THY'S BACKGROUND

Thy is a 48-year-old Cambodian woman who resides in Alameda County, California. AR 411. She was born in 1969 in Cambodia, and had a traumatic childhood growing up under the Khmer Rouge regime. AR 411, 805-806, 816-817. She was separated from her parents at eight years old and sent to work in a child labor camp, where Khmer Rouge soldiers forced her and other children to work 14 hour days in brutal conditions. AR 411, 805-806, 816-17. During this time, she experienced constant starvation and witnessed Khmer Rouge soldiers torture and murder civilians. AR 411, 805-806, 816-17. In one instance, a Khmer Rouge guard beat her in the head until she lost consciousness and threw her body in a river. AR 805, 816-817. Thy believes it was

4

1  "pure luck" that she and her family survived, as all of her family's friends and neighbors "were

2  taken to the killing fields."  AR 817.

3       Thy came to the United States from Cambodia in 1982 as a teenage refugee.  AR 891.  Her

4  primary language is Cambodian, and she reports that her ability to speak, write, and understand

5  English is limited.  AR 44, 316, 429.[4]  She enrolled in Fremont High School in Oakland,

6  California in 1985.  AR 313-314, 891.  Thy attended special education classes during high school,

7  and she graduated in 1988 with Ds and Fs.  AR 313-314, 817.  Thy worked fulltime in an

8  assembly job from 1991 to 1992 and 1996 to 1998.  AR 310.  From 1998 until January 2002, Thy

9  worked fulltime at a bakery packing bagels into boxes.  AR 310, 360, 401.[5]  This job required no

10 lifting, and Thy estimated that she spent approximately seven hours each day standing, stooping,

11 handling big objects, and/or reaching.  AR 310-11.

12      In 2001, Thy was raped by a stranger while she was walking home from work at night.

13 AR 71, 800, 817, 891.[6]  She became pregnant from the rape, and quit her job in January 2002

14 because she was scared to return to work.  AR 71, 800, 817, 891.  In July 2002, she gave birth to

15 her daughter, and Thy's father and step-mother became her daughter's legal guardians.  AR 83,

16 657, 806.[7]  Thy lives with her elderly father, step-mother, and daughter, and she spends most of

17

18 [4] There is some dispute about how proficient Thy is in the English language; Thy has indicated in
previous SSA forms and to her providers that she speaks no English (AR 308-309, 842), she
19 consistently had a Cambodian interpreter at her medical appointments and disability hearings (AR
653, 857 (appointments), required services in Cambodian (AR 659), and her attorney testified at
20 the ALJ hearing that she "speaks a little bit" of English, but isn't fluent and needed an interpreter.
21 AR 44.

22 [5] The record contains conflicting references regarding the year Thy began her job packing bagels
and when it ended. See AR 360 (work history report listing January 1998 start date); AR 401
23 (Office of Disability Adjudication and Review Form listing 1996 start date);  AR 309-10 (October
2005 disability report states that she stopped working in March 2002, while another section of that
24 report states that she stopped working in 2001).  Thy's attorney clarified at the August 19, 2015
hearing that Thy stopped working in January 2002.  AR 83.

25 [6] The details of Thy's rape are generally reported consistently throughout the record, with the
26 exception of the year it occurred, see AR 638 ("sexually assaulted by an unknown stranger in
2000"); AR 651-52 ("Thy required no psychiatric care until she was raped in 2003"); AR 800
27 ("raped in 2001 at 1:00 am after leaving her workplace"); AR 802 (raped in 2011).  Thy testified
at the ALJ hearing that she was raped in 2001, but could not remember the month.  AR 71.

28 [7] Thy's medical records inconsistently report the gender and date of birth of Thy's child.  Thy

the day at home. AR 638, 657. She is able to cook, shop for groceries, take her daughter places, independently take the bus, and perform minimal house chores. AR 116, 487, 817. In 2013, Thy attended temple "once every few months," and in July 2015 she reported going to temple "almost every Saturday and Sunday." AR 638, 806. She has not worked since 2002, and says she has no plans to seek employment because of her recurring health issues. AR 638, 647. In a SSA Function Report dated March 1, 2013, Thy reported that she goes outside "1 time a week" and can walk for 2 blocks before needing to rest, and that she has "diabetes, blood pressure, cholesterol, dizzy so that's why I can't go to work." AR 331. Thy has a driver's license, but takes the bus because she gets dizzy and is afraid to drive. AR 487, 490.

## III. THY'S MEDICAL HISTORY

### A. Mental Health Records

Thy received mental health treatment at Asian Community Mental Health Services ("ACMHS") from November 2005 to August 2006, and July 2013 to April 2015, and primary care treatment at Asian Health Services ("AHS") from November 2005 to August 2015. *See* AR 635-83, 825-987. Records detailing Thy's mental health treatment at ACMHS from 2005 to 2006 could not be located and are not included in the record. [8] However, Thy's characterization of her mental health issues as recorded by the SSA as well as the Agency's comments on Thy's records SSA reviewers considered are in the record. AR 636.

In an October 13, 2005[9] Adult Disability Report, Thy reported that she stopped working because of "morning sickness, nightmares, afraid of men after the raped trauma." AR 309. She sought treatment for "raped trauma events" at ACMHS in August 2005, where she "talked to someone to reduce my anger and fears," and was prescribed Paxil for depression. AR 309, 312-

---

testified at the ALJ hearing that her daughter was born on July 31, 2002. AR 83.

[8] Following the ALJ hearing, Thy's attorney informed the ALJ that ACMHS "did not have copies of any records prior to 2013." AR 417. She notes that as a result of Thy's concurrent treatment at AHS and ACMHS, her 2005 to 2006 medical records from AHS contain little information about Thy's mental health. Mot. at 9; *see also* AR 9.

[9] This document is not dated, however the exhibit list indicates it was completed on October 13, 2005. AR 30.

13. Thy also reported that she was admitted to the emergency room at Summit Medical Center on May 5, 2003, where she was kept overnight for "stomach problem, overdozing, suicidal attempt." AR 312.

The Quality Assurance Reviewer who completed the request for corrective action noted in his findings that "claimant reports a new traumatic event when she was raped and assaulted in 2001 with subsequent suicide attempts in 2002 (see 9/02/05 admit note from Asian Community MHS), but there are no records to substantiate her suicide attempts." AR 427. He further noted that "medical evidence in the current file includes a 5/03 report from Summit Medical Center for abdominal pain, which was resolved, the 9/05-10/05 notes from Asian Community Mental Health Services and the 12/05 psychiatric CE for posttraumatic stress disorder." AR 427. He concluded that "[f]urther medical development is needed to establish a basis for changed circumstance. That is, there is an increase in the severity of the claimant's PTSD and depression, which in turn requires an assessment of her credibility. It is necessary to document the claimant's alleged multiple suicide attempts in 2002 to confirm her assertion of a traumatic event." AR 427.

Similarly, in an April 11, 2006 medical evaluation form, state agency medical consultant Herbert Ochitill recommended that "the DDS attempt to obtain documentation of [Thy's] alleged 'multiple suicide attempts' in '02 to confirm [Thy's] assertion of a traumatic event and her psychological response to such an event. Up-to-date out[patient] treatment records from Alameda Co. [ACMHS] could clarify the ongoing severity of [Thy's] impairment." AR 434.

### B.    Treating Medical Sources

In November 2005, ACMHS referred Thy to AHS for primary care treatment. AR 782-89, 890-989. At her initial appointment on November 3, 2005, Thy told her treating physician and internist, Dr. Yee-Buh Lui, about her history of depression and that she had stopped taking Paxil and started taking Zoloft, which made her dizzy. AR 891. Thy reported that she was raped in 2001, which led to an onset of mental illness, and that her depression presented a barrier to her working. AR 891-93. Dr. Lui diagnosed Thy with Depression, Hypertension, uncontrolled Diabetes Mellitus, and Hyperlipidemia. AR 782-89, 900, 955-62. Thy continued to receive primary care treatment at AHS from Dr. Lui and other treating clinicians, including nurse

7

practitioner Le Thai ("NP Thai"), and Dr. Daveena Ma. AR 782-89, 793-798, 890-989. In March 2006, Thy saw a dietitian who noted Thy's "knowledge deficit in [diabetes] care," and helped her develop a nutrition care plan. AR 900. In January 2009, Dr. Lui switched Thy's depression medication from Lexapro to Fluoxetine (aka Prozac) for "formulary reasons," and his progress notes from May 2009 to November 2009 indicate that Thy's depression was "stable." AR 933, 935, 937, 939.

In 2008, Dr. Lui referred Thy to endocrinologist Dr. Frank Hsu for treatment of her diabetes. AR 971. On November 16, 2008, Dr. Hsu completed an initial diabetes evaluation of Thy and noted that she was taking medication for diabetes (metformin, glipizide, novolin, and insulin), hyperlipidemia (Simvastatin), hypertension (Cozaar), and anxiety (Lexapro). AR 971-72. Thy's physical examination indicated that she was in "no distress," and her "pulmonary, cardiac and abdominal examinations were normal." AR 972. Dr. Hsu found no thyromegaly, lymphadenopathy, retinopathy, nephropathy, or leg edema, and noted that Thy had normal sensation in her legs. AR 972. He concluded that "[b]ased on the elevated serum glucose and HbA1c values, the patient does have poorly controlled diabetes," and diagnosed Thy with hyperlipidemia, hypertension, obesity, and anxiety syndrome. AR 972-73. He adjusted Thy's insulin regimen and instructed her to work on her diet and exercise. AR 972-73. Thy continued to see Dr. Hsu every two to three months for diabetes treatment through February 2015. AR 556-85, 616-17, 685, 681, 749-76, 932-51.

Thy's laboratory reports and Dr. Hsu's progress notes from October 2009 to May 2014 indicate that Thy had high HbA1c levels and struggled to manage her diabetes, but note no eye, cardiac, renal or leg complications. AR 556-585, 762-64, 972-87. In November 2011, Dr. Hsu showed Thy how to properly draw and inject her insulin, as it appeared she was not adequately filling her syringe. AR 556. In November 2012, he noted that Thy "still has moderate insulin resistance," and had "run out" of her oral diabetes medication "for several months." AR 564.

On May 21, 2014, Dr. Hsu diagnosed Thy with diabetes mellitus with neurological manifestations, obesity, benign essential hypertension, nontoxic multinodular goiter, and depressive disorder, and noted that she was still taking Amblify which may worsen her glucose

control. AR 762-63. On July 2, 2014, Dr. Hsu found that Thy had "2+ leg edema" but no hyperglycemic reactions, and noted that she reported feeling "fine" was "eating better and has lower glucose values." AR 765. On September 3, 2014, Dr. Hsu noted "occasional hypoglycemic reactions due to fair eating and more exercise," and he found that Thy still had mild leg edema (2+) and "poor glycemic control due to poor adherence to diet from psychiatric illness." AR 768. Dr. Hsu's appointment notes from January 2013 and February 2013 also noted mild leg edema and "rare mild hypoglycemic reactions." AR 771-72, 774-75.

In a Physical Medical Source Statement dated June 1, 2015, Thy's treating clinicians NP Thai and Dr. Ma confirmed Thy's diagnoses of hypertension, uncontrolled diabetes, depression, and hyperlipidemia, and opined her prognosis was "fair-good." AR 783-89.[10] They noted that Thy suffered from dizziness (for which she took Medizine daily), fatigue, and sadness, and experiences impaired sleep "mostly due to meds, uncontrolled [diabetes], depression." AR 784. NP Thai and Dr. Ma indicated that Thy's tiredness could be from diabetes, and noted that she was still working with her endocrinologist (Dr. Hsu) and a psychiatrist for depression. AR 784. They indicated that Thy's depression, anxiety, Somatoform disorder, and psychological factors affected her physical condition, and that emotional factors contributed to the severity of her symptoms and functional limitations. AR 784. NP Thai and Dr. Ma opined that Thy's ongoing impairments would cause her to miss work more than 4 days per month, take unscheduled breaks "very often" (because of chronic fatigue), be "off task" more than thirty percent of the time, have "good days" and "bad days," and that she would need 4 hours of rest in an 8 hour work day (to relieve fatigue from dizziness). AR 784-89.[11] NP Thai and Dr. Ma found that Thy could perform manipulative activities such as reaching, handling, and fingering occasionally, lift/carry 10 pounds occasionally and 50 pounds rarely, stand/walk about for one hour in an eight hour work day (but for no longer

[10] NP Thai signed the statement on January 15, 2015; Dr. Ma signed it on June 1, 2015. AR 789. I will refer to it as the 2015 Medical Source Statement.

[11] It is unclear from the statement whether NP Thai and Dr. Ma meant to indicate that Thy needed an assistive device for walking (the handwritten "x" crosses both the "yes" and "no" boxes). *See* AR 786.

than 15 minutes at a time), sit for 4 hours day (but for no more than 30 minutes consecutively), climb stairs and ladders rarely, and balance, twist, stoop, crouch, and squat occasionally.  AR 787-88.

In July 2013, Thy resumed mental health treatment at ACMHS, after she reported having suicidal thoughts to her providers at AHS.  AR 635, 655.  Thy received ongoing treatment from licensed clinical social workers ("LCSW") Bunthy Prum and Katherine Chun, Ph.D., case manager Catherine Meas-Powell ("CM Meas-Powell"),[12] Approved Social Worker Nary Pech, and psychiatrist Dr. Tim Lukaszeswki through April 2015.  AR 635-83, 790-92.

On July 25, 2013, LCSW Prum completed an initial assessment of Thy, and noted Thy's symptoms as feeling worthless and worried, being unable to sleep at night, having nightmares of the Cambodian civil war five days a week, feeling fatigued during the day, and experiencing hypervigilance.  AR 635, 639.  Thy told Prum that she had attempted to stab herself in the chest with a knife "on a few occasions" in March 2013, and ranked her current desire to harm herself "at an 8 on a scale of 1 to 10."  AR 636, 640.  Prum found that Thy's mental processes were "[r]elevant, logical, and linear," and observed that she appeared sad, lethargic, and tearful.  AR 639.  Prum noted that Thy's current medications, Fluoxetine, Novolog, Metformin, Hydrochlorothiazide, Acarbose, Simvastatin, Pioghitazone, Losartan, Aspir-low, were prescribed by Drs. Lui and Hsu, and nurse practitioners Christina Ng and Gina Nguyen.  AR 636, 655.  Prum indicated that Thy was misusing her medication by taking it in the afternoon to alleviate symptoms, rather than at night as directed.  AR 635-36.  Prum concluded that Thy had passive suicidal ideation and needed a high level of clinical care "to prevent high risks of returning to former impairments and prevent hospitalization." AR 635.  On August 7, 2013, Prum diagnosed Thy with "Major Depressive Disorder, Recurrent, Severe Without Psychotic Features," and assigned her a Global Assessment of Functioning ("GAF") score of 46.  AR 641.

Prum developed a 6-month treatment plan (for the period of July 26, 2013 to January 31,

---

[12] The record indicates that CM Meas-Powell speaks Khmer (Cambodian), and that she interpreted for Thy at many of her appointments and group therapy sessions.  *See* AR 653, 857.

2014), to reduce Thy's risks of suicide and self-harm and to help her improve sleep habits, self-image, and ability to process depressive feelings. AR 643-46. Thy's treatment plan included a diagnosis of "r/o PTSD." AR 643. Per the treatment plan, Thy attended individual bi-monthly therapy sessions with CM Meas-Powell and LCSW Chun. AR 643-46, 825-51. Thy also attended wellness and support groups aimed at diabetes management and healthy eating from September 2013 to April 2015. AR 672, 825-889.

On December 30, 2013, Thy was discharged from ACCESS because she no longer met the criteria for the level of care and services offered under that program. AR 647. Thy's case manager Meas-Powell and LCSW Chun noted that Thy "partially achieved [treatment] goals" but "continues to struggle to manage anxiety [symptoms] as triggered by hypervigilance or when in the presence of African American males," and is "encouraged to continue [treatment] services under lower level of care to maintain stability and to prevent onset of decompensation," as she "has a [history] of [suicide ideation] and violent rape." AR 647-49. The form listed a current GAF score of 46, and a highest past year score of 50. AR 648.

On January 16, 2014, Thy enrolled in an integrated primary care program (ACMHS' "Level 3 Adult Program"), which offered less intensive care than ACCESS, but allowed her mental health providers at AMCHS to coordinate with her primary care providers at AHS. AR 853-884. On January 17, 2014, LCSW Chun completed an initial mental health assessment of Thy under the Level 3 Adult program, and diagnosed her with major depressive disorder, recurrent, severe without psychotic features. AR 654-61.[13] Chun also noted that Thy had diabetes, high blood pressure, high cholesterol, and anemia, but indicated that depression was the focus of clinical attention. AR 660. Thy reported that she had last thought about suicide "during early December when the holiday was approaching and she felt numb and depressed," and that her father had "hid sharp objects and ropes from her." AR 655. Thy said she did not intend to follow through with hurting herself "due to thinking about her daughter's welfare if she was gone." AR

---

[13] Chun signed the initial assessment on January 21, 2014; Dr. Lukaszewski signed it on March 5, 2014. AR 661.

659. Thy also reported being dizzy, lightheaded, and having blurry vision, and complained of sitting for too long, and Chun observed that although Thy appeared anxious and stressed when answering questions about her past trauma, she was overall open and forthcoming with answers. AR 658. Thy continued individual therapy sessions with CM Meas-Powell approximately once a month until January 2015. *See* AR 858-88.[14]

At a January 24, 2014 appointment with CM Meas-Powell, Thy reported being "scared when I leave my home. I always feel that I may be attack anytime. I feel so week and stupid," and said her anxiety about her sexual assault impacted her motivation to connect with others. AR 859. CM Meas-Powell noted that Thy appeared depressed but oriented, and diagnosed her with PTSD. AR 858.

The majority of CM Meas-Powell's session notes from January 2014 to December 2015 show that Thy's diabetes and mental health symptoms fluctuated, with periods of improvement followed by recurrent dizziness, anxiety, weight gain, and trouble sleeping. *See e.g.*, AR 856 (noting Thy's "[d]epressed and sad" mood and "ashamed and tearful" affect); AR 860 (noting Thy's "depressed" mood); AR 862 (reporting Thy "feel scare all the time"); AR 864 (noting that Thy wakes up at night with "body sweats, [] increased heart rate, and feeling scared", and reporting that Thy received psychoeducation on signs and symptoms of PTSD; AR 867 (noting Thy felt "less motivated and has increased fatigue," and that her "anxiety-like" symptoms are exacerbated by her frequently waking up at night); AR 869 (noting Thy is exercising daily and taking her medication as prescribed, feeling "fine and good today" and "is getting along and feeling the support of her family"); AR 871 (reporting Thy is "feeling happy and well today, but worried," and was "experiencing increased headaches and dizziness for the past week," that she was taking her medications as prescribed, and doing household chores daily, and noting that Thy's cousin died the week prior, and she "tried to cope" with the death by "eating and sleeping"); AR 873 (noting Thy reported "feeling well, but worries a lot more than usual," feeling "frustrated that

---

[14] Thy saw LCSW Soojung Han and Approved Social Worker Nary Pech in April 2015; the session notes from this appointment indicate that Thy's primary case manager was unavailable, and that she was struggling to cope with the grief and sadness of the recent loss of her cousin, who she was close with. AR 888-89.

her weight and dia[betes] symptoms continue to increase and her overall health continue to decline," and experiencing an "increased sense of hopelessness, helplessness, and lack [of] interest in doing things she used to find enjoyable"); AR 875 (noting Thy felt "'desperate' as she continues to manage diabetes problems and weight"); AR 877 (noting Thy felt "fine" today); AR 879 (noting Thy "worries about her diabetes symptoms despite managing it as best she can," "feel[s] hopeless and helpless intermittently when she has a difficult time managing her diabetes problems," and "feels more anxious and is easily startled when the sun begin to set"); AR 881 (noting Thy reported "feeling well today despite experiencing daily struggle to manage chronic diabetes symptoms," and is "so mad at [herself] for not knowing how to stop feeling scared when [she is] alone," and "feel[s] like someone will be out to get [her] or [she] may be hurt by someone" when it gets dark outside); AR 883 (noting Thy "worried most of the day every day" since she received notice of potential discontinuation of her SSI benefits, and that she feels that she is "worthless, a beggar, useless to nobody" and "may experience an anxiety attack"); AR 885 (reporting Thy felt anxious because her HbA1c was "over 200 this morning," and that she "experienced anxiety-like symptoms when she was at temple" around male parishioners, including dizziness, shortness of breath, and feeling upset at herself); AR 887 (reporting Thy is "feeling upset at herself for dealing with chronic diabetes and poor health" and that she "feel[s] so hopeless everyday [she has] to deal with this illness").

On February 13, 2014, Thy began seeing Dr. Lukaszewski for "help dealing with her fear of going outside, general fear of being harmed and recurrent recollection of having been raped in 2003."[15] AR 651. Lukaszewski noted that Thy "required no psychiatric care until she was raped" and that since her rape, she "has suffered near-continual recollection," and is "often anxious" and "fearful of leaving her home." AR 652. Thy reported that fluoxetine 20 mg daily, which she had taken for the past five years without any dosage adjustments or augmentation, "hasn't helped." AR 652. Lukaszewski diagnosed Thy with chronic PTSD and doubled her fluoxetine dosage to

---

[15]  Dr. Lukaszewski (incorrectly) references 2003 as the date of Thy's rape in all of his appointment notes.  AR 667, 670, 675, 678, 681, 791.

1    40 mg daily, finding that her "ongoing PTSD [was] not adequately treated with current

2    fluoxetine." AR 653. He assigned her a GAF score of 47 and noted PTSD criteria "target

3    symptoms" as intrusive recollection of rape, avoidance of thinking about rape, fear of leaving

4    home, r/o nightmares, arousal, anxiety, and affective numbing. AR 651-52.

5         Thy saw Lukaszewski for the second time on March 20, 2014, and reported "no change in

6    her status since the last session" and that she continued to suffer from nightmares, intrusive rape

7    recollections, and debilitating worries. AR 666. Lukaszewski noted that Thy was having trouble

8    sleeping, but eating well, exercising regularly, and "taking good care of [her]self." AR 667. He

9    found Thy "not to be at imminent risk of harming self," assigned her a GAF score of 47, and

10   began her on a trial of Aripiprazole (Abilify) 5 mg nightly in addition to her fluoxetine 40 mg each

11   morning. AR 668. On April 10, 2014, Lukaszewski assigned Thy a GAF score of 49, and

12   doubled her dosage of Aripiprazole to 10 mg nightly. AR 669. Lukaszewski saw Thy again on

13   August 4, 2014, and noted that she was engaged, pleasant, and calm, and that her mood was

14   euthymic and stable. AR 675. He noted that she was "making good efforts to attend to nutrition

15   and regular exercise, but recently gained weight after death of a family member," and assigned her

16   a GAF score of 55. AR 676. Lukaszewski found that Thy's intrusive recollections of rape "have

17   abated," and her avoidance of thinking about the rape had "also diminished," and he concluded

18   that her current fluoxetine and aripiprazole regimen was efficacious. AR 675. Lukaszewski's

19   appointment notes from October 27, 2014 and January 12, 2015 indicate similar findings and an

20   increased GAF score of 58. AR 677-82. On April 6, 2015, Lukaszewski concluded that Thy's

21   chronic PTSD was "in near-full remission," and assigned her a GAF score of 60. AR 792. With

22   respect to Thy's physical health, Lukaszewski noted that her diabetes was not in control, and

23   discussed nutrition and exercise with her "at length." AR 791.

24        In June 2015, Thy began receiving mental health treatment at Center for Empowering

25   Refugees and Immigrants ("CERI") from psychiatrists James Gracer and Mona Afary. AR 799-

26   824.[16] At her initial appointment on June 30, 2015, Thy told Afary about her rape in 2001 and

27   _____

28   [16] CM Meas-Powell and Thy's attorney referred her to CERI. AR 800.

resulting that her "life has never been the same since I was raped." AR 800-01. Thy reported

being chronically depressed since her sexual assault, and that she has flashbacks every day,

"continually lives in fear and panics easily," and is "not able to focus on her actions and drops

things." AR 800-01. Afary described Thy's psychological status as "suffers from PTSD

symptoms with panic attacks," and referred Thy to Gracer for medication management." AR 800-

01.

On July 9, 2015, Afary and Gracer administered the Harvard Trauma Questionnaire, a

checklist of trauma events and symptoms developed by the Harvard Program in Refugee Trauma

to assist in the diagnosis of PTSD. AR 808-816. Thy's results indicated that she was

symptomatic for PTSD. AR 815. Gracer prescribed her Remeron 30 mg daily for insomnia and

depression. AR 799, 807.

During a July 14, 2015 appointment with Afary, Thy "opened up" about her childhood in

Cambodia under the Khmer Rouge and her 2001 rape and resulting pregnancy. AR 805. Afary

noted that Thy does not trust or feel safe around men, except for her father, and that she blames

herself and feels ashamed about being raped. AR 806. Thy also reported having nightmares and

flashbacks of the rape scene and feeling anxious, panicky, fearful, and depressed because she was

unable "to get rid of those images." AR 802. Thy told Afary, "I hear this voice in my head telling

me I will kill you," which is what Khmer Rouge soldiers had said to her as a child. AR 802. Thy

reported that this voice "came back loud and clear" after her rape, and said she can't do anything

to stop it, which "is why she wishes death." AR 802.[17] Afary confirmed that Thy did not have a

suicide plan. AR 802.

On July 28, 2015, Gracer and Afary conducted a psychological evaluation of Thy and

diagnosed her with PTSD and Dysthymic disorder and assigned her a prognosis of "poor." AR

816-18. Thy reported that it is "very hard for her to complete a task as she is not able to let go of

her obsessive thoughts," and that she "burns food, drops things and forgets what she was supposed

to do." AR 818. Her psychiatrists concluded that Thy "would not be able to complete a normal

---

[17] Dr. Afary's notes from this appointment list 2011 as the date of Thy's rape (AR 802), however her notes from other appointments list 2001 as the date of the rape. *See* AR 800, 806.

work day without being interrupted by mood disturbances and intrusive recollections of her traumatic experiences," that she "cannot maintain a regular daily schedule due to her fatigue and exhaustion," and that she "has a short attention span and would be easily distracted by those working around her."  AR 818.

In August 2015, Gracer and Afary completed a Mental Impairment Questionnaire, and found that Thy's ability to understand and remember detailed instructions and maintain attention and concentration for a two-hour period were extremely limited, and that Thy had experienced "three or more episodes of decompensation within 12 months, each at least two weeks long."  AR 822-23.  They found that Thy "struggles with panic attacks, obsessive thoughts, flashbacks and auditory hallucinations," "won't be able to keep a regular daily schedule due to her sleep problem," "is unable to have a professional relationship with her male colleagues, as she is petrified of men [and] has been staying away from men in the past 10 years" and "cannot handle criticism and needs to take breaks throughout the day as her attention span is less than 45 minutes."  AR 824.  Based on these impairments, they determined that Thy would miss five or more days of work per month and would be off-task more than thirty percent of the time.  AR 824.

### C.    Examining Medical Sources

On June 14, 2013, state agency psychiatric examiner Dr. Patricia Spivey completed a psychological disability examination and evaluation of Thy.  AR 486-87.  Spivey did not review any documents relating to Thy's medical history, and based her findings and diagnoses on "today's evaluation including test scores, mental status exam and clinical interview."  AR 488.  At the examination, Thy said (through a Cambodian interpreter) that she worked for five years at a bakery, that she also worked at an assembly job that ended in 2009.  AR 487.[18]  Thy stated that she takes the bus, "feels faint and is afraid to drive," and that she is able to shop, cook, and take her daughter places.  She complained of fainting spells, and reported that she has diabetes, hypertension, and high cholesterol.  AR 487.  Thy also reported being depressed in the past, having nightmares, and previously attempting to kill herself.  AR 487.  Spivey noted that "more

---

[18] Thy testified at the ALJ hearing that the last time she worked was in January 2002.  *See* AR 70-71.

information [was] needed regarding Thy's depression, as she was "very vague about details." AR 487. Spivey found "[n]o signs of acute mental illness, mood disorder, or thought disorder," and noted that Thy was "[c]ooperative but quiet and not forthcoming with information" and "avoided many questions. AR 488. With respect to Thy's "present functioning," Spivey concluded that Thy "was unable to produce details about psychiatric history, either due to cultural differences or unwillingness to elaborate. On intake forms and in verbal response she was only describing medical issues. She was in no apparent distress." AR 488. Spivey also noted that Thy was unable to complete calculations correctly or interpret a metaphor, that her general knowledge was "poor," and that she only "[r]ecalled 2 of 3 items after a brief delay," but her long term memory was good. AR 488. Spivey's diagnostic impressions ruled out malingering and "Depressive Disorder NOS [not otherwise specified]," but she was "unable to determine" a prognosis, as "no collateral information was available." AR 489. As to Thy's work-related abilities, Spivey found mild impairment in Thy's ability to maintain adequate attention and concentration, withstand the stress of a routine work day, and maintain emotional stability and predictability were mildly impaired, but no impairment in her ability to follow simple or complex instructions, maintain adequate pace to complete simple repetitive tasks or complex tasks, adapt to changes in job routine, communicate with others verbally or in writing, and interact appropriately with coworkers, supervisors, and the public on a daily basis. AR 489.

On June 19, 2013, Dr. Farah M. Rana, a non-treating examining neurologist, completed a one-time internal medicine evaluation of Thy. AR 490-42. Thy reported being diagnosed in 2005 with type two diabetes and hypertension, for which "she has been on medications all along," and denied having retinal or renal complications from diabetes or having any numbness or paresthesia in her hands and feet. AR 490. Thy also reported that "[s]he has issues with depression and has been on antidepressants for a while," but that her "mood is stable as long as she takes her medication," and that "she can do her day-to-day activities, but she gets tired easily." AR 490. Rana noted that "[t]here are a couple of progress notes available when [Thy] has been followed for diabetes type 2, hypertension, and depression," and listed "losartan, simvastatin, baby aspirin, metformin, glipizide, Actos, fluoxetine, hydrochlorothiazide, Lantus, and NovoLog" as Thy's

17

current medications.  AR 490-91.  Rana did not find any dependent edema or localized

inflammation or swelling in Thy's extremities, and noted that Thy had full range of motion in her

joints.  AR 491.  Rana rated Thy's motor strength as a "5/5 throughout," and found no gait

abnormalities, sensory deficits, or aphasia or dysarthria.  AR 491.  She wrote that Thy was

"cooperative with the examination," and concluded that Thy presented with diabetes type two, had

a history of hypertension, and had a reported history of depression.  AR 491.  Rana found that Thy

had no sitting or postural limitations, did not need an assistive device, and that she could take

public transportation, stand and walk for 6 hours with breaks in an 8 hour day, carry 25 pounds

frequently and 50 pounds occasionally, and push and pull devices up to 50 pounds.  AR 492.

### D.     Non-Examining Medical Sources

On July 15, 2013, non-examining agency psychological consultant Dr. P.M. Balson

completed a Psychiatric Review Technique based on a review of Spivey's and Rana's June 2013

examinations.  AR 493-504.[19]  Balson concluded that Thy's mental impairments (12.04 Affective

Disorders) were not severe, and found that Thy's allegations were "partially credible," as her

"[v]ague statements that she is unable to work are not fully supported by the evidence in file" and

"some level of fatigue is expected with [Thy's] condition but not to the extent reported."  AR 503.

Balson agreed with Spivey and Rana that Thy was capable of medium RFC with mild limitations.

AR 503.

On July 18, 2013, V. Phillips MD, a non-examining state agency medical consultant,

---

[19] The "Consultant's Notes" section of the Psychiatric Review Technique refers to an undated "Comparison Point Decision" (presumably from 2005, as it lists Thy's age of 36), which Dr. Balson summarized as follows:

> Comparison Point Decision
> Age:  36    EOD [Established Onset Date]:  n/a
> Basis/Type of Decision:  n/a
> Allegations:  Shaky, dizziness, headaches, insomnia, fatigue
> Findings:  At initial level, claim was allowed by DDS.  Case was reviewed by [Disability Quality Branch] and returned to DDS for additional development.  After reviewing the additional evidence and considering a prior ALJ unfavorable affirmation, DDS determined that the ALJ decision would be adopted and claim should be denied.  The [Field Office] mistakenly inputted [sic] the case as an allowance and clmt was erroneously placed in pay status.

AR 503.  Balson noted that "[g]iven the information under comparison point decision above, there is an exception to MI [Medical Improvement]."  AR 503.

1   completed a "Physical Residual Functional Capacity Assessment," and determined that Thy had a

2   medium RFC.  AR 505-510.  Phillips listed a primary diagnosis of Diabetes Mellitus and

3   secondary diagnoses of obesity, hypertension, and hyperlipidemia.  AR 505.  He endorsed the

4   same exertional limitations as Rana (that Thy could stand and walk for 6 hours with breaks in an 8

5   hour day, carry 25 pounds frequently and 50 pounds occasionally, and push and pull devices up to

6   50 pounds), and additionally determined that Thy could sit for 6 hours with normal breaks in an 8

7   hour day.  AR 506.  Phillips found no evidence of postural, manipulative, visual, communicative,

8   or environmental limitations, and he noted that the conclusions of the other treating/examining

9   sources regarding Thy's limitations or restrictions were not significantly different from his own

10  findings.  AR 510.

11          On October 25, 2013, non-examining agency psychological consultant Dr. R. Lee

12  reviewed the record for a "Mental Residual Functional Capacity Assessment" (AR 586-89), a

13  "Psychiatric Review Technique" (AR 590-600), and a "Case Analysis" (AR 601-606).   Lee

14  determined that Thy was "mentally capable of adapting to and performing sustained simple tasks,

15  with limited public interactions."  AR 588.  Thy was moderately limited in her ability to

16  understand, remember, and carry out detailed instructions, maintain attention and concentration for

17  extended periods, work in coordination with or proximity to others without being distracted by

18  them, "complete a normal workday and workweek without interruptions from psychologically

19  based symptoms," interact appropriately with the public, and respond appropriately to changes in

20  the work setting.  AR 586-87.  Lee also indicated that Thy had an affective disorder, specifically

21  "depressive syndrome," characterized by symptoms of appetite disturbance with change in weight,

22  sleep disturbance, decreased energy, and thoughts of suicide.  AR 952.  Lee concluded that Thy

23  had moderate functional limitations, including restriction of activities of daily living, and

24  difficulties in maintaining social functioning, concentration, persistence or pace.  AR 598.  Lee

25  found that there was insufficient evidence to determine whether Thy had repeated episodes of

26  decompensation.  AR 598.

27          On October 29, 2013, non-examining medical consultant Joan Bradus MD reviewed Thy's

28  records and completed a "Physical Residual Functional Capacity Assessment."  AR 607-614.

Bradus determined that Thy had a RFC to perform medium work, with some postural limitations due to Thy's reported dizziness and "poor control" of her diabetes and hypertension.  AR 609, 614.  Specifically, Bradus concluded that Thy could occasionally balance and stoop and climb ladders, ropes, and stairs, and frequently climb ramps and stairs, stoop, kneel, crouch and crawl.  AR 609.

## IV.    DISABILITY DETERMINATION

A claimant is "disabled" if:  (1) "[s]he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the impairment is "of such severity the [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 1382c(a)(3)(A)-(B); *see Hill v. Astrue,* 698 F.3d 1153, 1159 (9th Cir. 2012).

### A.    The Five-Step Inquiry

An ALJ engages in a five-step sequential analysis to determine whether a claimant is disabled.  *See* 20 C.F.R §§ 404.1520(a) and 416.920(a).  In the first step, the ALJ determines whether the claimant is engaged in substantial gainful activity ("SGA").[20]  20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i).  If the claimant is not engaging in SGA, the ALJ determines in step two whether the claimant suffers from a severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii).  An impairment must have lasted or be expected to last 12 months in order to be considered "severe." *Id.* § 416.909.[21]  In step

---

[20] Substantial activity is defined as work requiring significant physical or mental activity.  20 C.F.R. §§ 404.1572(a) and 416.972(a).  Gainful activity is "work usually done for pay or profit," regardless of whether the claimant is actually compensated.  20 C.F.R. §§ 404.1572(b) and 416.972(b).

[21] In addition, a "severe" impairment or combination of impairments significantly limits an individual's ability to perform basic work activities.  *Id.* § 416.920(c).  Conversely, an impairment or combination of impairments that is "not severe" within the meaning of the regulations is only a slight abnormality that has no more than a minimal effect on an individual's ability to work.  *Id.* § 416.921.

1  three, the ALJ determines whether the claimant's impairment or combination of impairments

2  meets or medically equals the criteria of an impairment listed in the administrative regulations.

3  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, App. 1; *see*

4  *also* 20 C.F.R. §§ 404.1525 and 416.925. If the claimant satisfies the criteria of a listed

5  impairment, she is disabled; if not, the ALJ proceeds to the next step.

6       Before step four, the ALJ determines the claimant's Residual Functional Capacity

7  ("RFC"), which is his ability to perform physical and mental work activities on a sustained basis

8  despite the limiting effects of his impairments. 20 C.F.R. §§ 404.1520(e) and 416.920(e). In

9  making this finding, the ALJ considers all the evidence in the record including the claimant's

10  severe and non-severe impairments. 20 C.F.R. §§ 404.1520(e), 404.1545; 416.920(e), and

11  416.945. At step four, the ALJ determines whether the claimant has the RFC to perform the

12  requirements of his "past relevant work."[22] 20 C.F.R. §§ 404.1520(a)(4)(iv) and

13  416.920(a)(4)(iv). If the claimant cannot perform her past work, the ALJ determines in step five

14  whether the claimant can perform any other work existing in the national economy considering her

15  RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v).

16  If the claimant is able to do other work, she is not disabled.

17       **B.   ALJ's Decision**

18       At step one, the ALJ found that Thy had not engaged in any "substantial gainful activity"

19  since 2001. AR 16. At step two, the ALJ found that Thy had severe impairments of "uncontrolled

20  diabetes mellitus, obesity, an anxiety disorder, and an affective disorder," which "more than

21  minimally affect the claimant's ability to perform basic work functions." AR 16-17. With

22  respect to Thy's other alleged impairments, the ALJ concluded:

23       Medically determinable impairments such as benign hypertension, possibly a
         history of obstructive sleep apnea, well-controlled hyperlipidemia, iron deficiency
24       anemia, resolved hypokalemia, resolved indigestion, history of vertigo, and likely
         many other impairments are not severe because there is no probative evidence that
25

26  _____

27  [22] "Past relevant work" means substantial gainful activity performed (either as the claimant
    actually performed it or as it is generally performed in the national economy) within the last
28  fifteen years or fifteen years prior to the alleged disability onset date. 20 C.F.R. §§ 404.1560(b),
    404.1565, 416.960(b), and 416.965.

United States District Court
Northern District of California

these impairments more than minimally affect the claimant's ability to perform basic work functions. All impairments, however, regardless of severity, as well as the claimant's self-described limitations and subjective pain, have been considered in combination in assessing the claimant's residual functional capacity.

AR 17.

At step three, the ALJ found that these impairments did not meet or medically equal the criteria for disability listed in the administrative regulations. AR 17. With regard to diabetes mellitus, the ALJ concluded that the record lacked the "necessary objective findings" to satisfy SSA criteria—namely, evidence of "neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities" or evidence that Thy "has experienced end organ damage or an impairment secondary to diabetes." AR 18. Similarly, the ALJ determined that the record did not contain adequate evidence of anemia. AR 17. The ALJ determined that obesity, which is not a listed impairment, did not sufficiently limit Thy's "ability to perform routine movement and necessary physical activity within the work environment." AR 17.

With respect to Thy's anxiety and affective disorders, the ALJ found that "[t]he severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criterial of listings 12.04 and 12.06." AR 18.

At step four, the ALJ determined that Thy had the RFC to "perform medium work as defined in 20 C.F.R. § 416.967(c). Non-exertionally, she should not climb ladders, ropes, or scaffolding. She can frequently climb ramps and stairs, and frequently balance, stoop, kneel, crouch and crawl. The claimant can interact with the public occasionally." AR 20. The ALJ found that while Thy's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms and limitations," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." AR 20.

In reaching this determination, the ALJ found that objective diagnostic imaging—consisting of a July 2012 bilateral screening mammogram and a June 2013 pelvic ultrasound—did not support a finding of disability or severe impairment. AR 20-21. The

ALJ also determined that "a preponderance of the objective of evidence of record does not support a finding of disability." AR 21. He noted that "the record is replete with evidence of daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations," and that Thy "has not received the type of medical treatment one would expect for a totally disabled individual." AR 24-25.

The ALJ accorded "great weight" to the opinions of one-time examining neurologist Rana, non-examining medical consultants Phillips and Bradus, and non-examining psychological consultant Lee. AR 21, 23. The ALJ also accorded "great weight" to the opinion of non-examining agency medical consultant Dr. Kweli Amusa, who testified at the ALJ hearing that Thy's physical impairments did not meet or equal a listed impairment. AR 24.[23] ALJ Laverdure gave "very little weight" to the June 2015 medical source statement of Thy's treating physicians NP Thai and Dr. Ma because their opinion "is brief, conclusory, and inadequately supported by clinical findings," and inconsistent with RFC assessment of "two non-examining sources, an examining source, and a medical expert." AR 22.

As to Thy's mental impairments, the ALJ found that "the record is quite benign and mostly lacking prior to June 2013, when the SSA determined that the claimant had been erroneously paid benefits." AR 22. In determining that "there is no credible objective evidence showing [Thy] suffers from disabling symptoms," the ALJ gave "very little weight" to the opinions of CERI psychologists Gracer and Afary, who "relied heavily on the subjective report of symptoms and limitations provided by [Thy], and seemed to accept uncritically as true most, if not all, of what [Thy] reported." AR 24. The ALJ opined that doctors Gracer and Afary "were either unaware of—or chose to ignore—all other evidence . . . that shows a long history of no mental health treatment, followed by brief treatment and rapid improvement in [Thy's] alleged symptoms." AR 24. The ALJ similarly gave "little weight" to the July 2013 opinion of non-examining agency psychological consultant

---

[23] At the ALJ hearing, Dr. Amusa testified that "I'm not an expert in mental health." AR 59.

Balson, who concluded that Thy had no severe mental impairments, because "the record as a whole supports severe mental impairments." AR 22. The ALJ accorded "some weight" to the opinion of agency psychiatric examiner Dr. Spivey—who ruled out depressive disorder and concluded that Thy had no significant limitations from a mental impairment—but found that Spivey "did not give enough consideration to [Thy's] self-reported limitations and feelings of anxiety." AR 22. Additionally, the ALJ concluded that there "is ample reason to find the claimant not entirely credible." AR 24. Among those reasons was that Thy "apparently sought no mental health treatment until after the SSA initiated proceedings in 2013," and that it is "doubtful that the claimant does not have some capacity to communicate in English" as she graduated from high school. AR 24-25.

At step five, the ALJ determined that Thy is capable of performing past relevant work as a hand packager, which a Vocational Expert ("VE") testified at the hearing "is an unskilled, exertionally medium occupation." AR 25. The ALJ also made "alternative findings" as to step five, and determined that there are other jobs in the national economy Thy could perform. AR 25. Specifically, he considered Thy's "age, education, work experience, and residual functional capacity," and determined that she could perform "unskilled work at the medium, light and sedentary exertional levels," as these jobs "ordinarily involve dealing primarily with objects, rather than with data or people." AR 26. In making this finding, the ALJ found that Thy "has at least a high school education and is able to communicate in English to some undisclosed degree." AR 25.

## LEGAL STANDARD

### I. SUMMARY JUDGMENT

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has

1   made this showing, the burden then shifts to the party opposing summary judgment to identify

2   "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary

3   judgment must then present affirmative evidence from which a jury could return a verdict in that

4   party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

5   **II.   STANDARD OF REVIEW**

6        Under 42 U.S.C. § 405(g), district courts have jurisdiction to review the final decisions of

7   the Commissioner of Social Security. The Commissioner's decision must be upheld unless the

8   determination is not supported by substantial evidence or is based on legal error. *See* 42 U.S.C. §

9   405(g); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.1996).

10        Substantial evidence is "more than a mere scintilla, but less than a preponderance." *Saelee*

11   *v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal quotations and citations omitted). Substantial

12   evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

13   conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotations and citations

14   omitted). A court must review the record as a whole and consider adverse as well as supporting

15   evidence. *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (a reviewing court

16   "may not affirm simply by isolating a specific quantum of supporting evidence.") (internal

17   quotations and citations omitted). Where "evidence is susceptible to more than one rational

18   interpretation," the ALJ's decision must be upheld. *See Morgan v. Comm'r of the Soc. Sec.*

19   *Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).

20        Legal error occurs when an ALJ "breaches its special duty to fully and fairly develop the

21   record and to assure that the claimant's interests are considered, resulting in non-harmless legal

22   error to the applicant." *Hassan v. Colvin*, No. 12-cv-05821-RS, 2015 WL 2358023, at *1 (N.D.

23   Cal. May 15, 2015) (internal quotations and citations omitted). Reversal is not warranted if the

24   legal error is "inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674

25   F.3d 1104, 1115 (9th Cir. 2012) (internal quotations omitted).

26                                **DISCUSSION**

27        Thy makes several challenges to the ALJ's conclusions. She argues that the ALJ erred by:

28   (1) failing to fully develop the administrative record from Thy's prior claims and by refusing to

hear testimony from a psychiatric medical expert; (2) rejecting the opinions of Thy's treating medical sources without clear and convincing reasons; (3) discrediting Thy's subjective complaints without clear and convincing reasons; (4) relying on a RFC finding that is not supported by substantial evidence; and (5) relying on an incomplete hypothetical, vocational expert testimony, and medical-vocational guidelines that do not accurately reflect all of Thy's limitations.  Pl. Mot. at 8-9.

## I.      NEED TO FULLY DEVELOP THE ADMINISTRATIVE RECORD

Thy contends that the ALJ erred by (1) failing to obtain and consider evidence from her prior claim file, and (2) failing to call a psychiatric medical expert to testify, despite "substantial evidence of mental impairment and non-exertional limitations."  Pl. Mot. at 9.  She asserts that these errors are particularly harmful in light of the ALJ's finding that "as for mental impairments, the record is quite benign and mostly lacking prior to June 2013," even though there is evidence in the record indicating that Thy had received mental health treatment prior to June 2013.  Pl. Mot. at 9; AR 22.

The Ninth Circuit has explained that "[i]n Social Security cases, the ALJ has a special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel."  *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001).  This duty "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  *Id*. at 459-60.  "The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).

As to the prior claim file, Thy argues that the ALJ's failure to fully develop the administrative record by not obtaining and incorporating evidence from her prior claim constitutes reversible error.  Pl.. Mot. at 9; Reply at 4.  Plaintiff asserts that evidence from her prior claim file is necessary because: (1) the evidence of disability from 2006 is relevant to a determination of whether she is disabled now and (2) whether she was disabled prior to her date of last insured in

2007 is relevant as to whether she is entitled to Title II benefits. Reply at 3. Thy further contends that "[t]here is no notice or other explanation in the record for the determination that she was erroneously found disabled in 2006, and therefore she has not been provided with due process to challenge that determination." Reply at 2. The Commissioner responds that the ALJ had no duty to include Thy's prior claim file because the "Group 1 exception" applies to this case, meaning the only question before the ALJ was whether Thy is currently disabled. Def. Mot. at 13. The Commissioner also contends that any duty to develop the record was satisfied when the ALJ kept the record open after the hearing, allowing plaintiff to submit additional information. *Id*. at 14. Plaintiff agrees that the Group 1 exception applies, and thus "the starting point for determining disability should be July 2013, when she was first found not disabled during the CDR process." AR 419. However, Thy argues the claim file is nonetheless relevant to why she was (or was not) found disabled in 2006, especially in light of the ALJ's reliance on the fact a record of mental health treatment and mental health issues is absent prior to 2013.

The status of Thy's prior claim file—including the entirety of its contents—is unclear from the record. ALJ Laverdure notes that "[w]e do not have Judge McCarrick's decision," and at the hearing he remarked, "[a]t this point, I don't know what [the DDS based the initial determination on that she wasn't disabled" and "[w]e don't know what records they had to make that determination." AR 49-50; *see* AR 601. Thy's attorney testified at the hearing, "I tried to get the prior file to see if there were any records in the prior file, but they weren't included." AR 49. The ALJ responded that "[t]here is a prior file here. Let me see if there's anything in there. It might have only been a paper file at the time. The prior file consisted of those three documents [exhibits] 1, 2, and 3F." AR 49. The three exhibits referred to by the ALJ are agency medical consultant Ochitill's half-page "Case Analysis" notes from April 11, 2006, in which he recommended that the DDS obtain Thy's medical records to confirm her reported suicide attempts (AR 434), and the Review of Mental Residual Functional Capacity Assessment form (AR 437-38) and Review of Psychiatric Review Technique form (AR 435-36), also dated April 11, 2006, in which he indicated that "ME needed to clarify severity of impairment." AR 435-38. The ALJ

1    further commented that "[t]here might have been other paper records that didn't get incorporated

2    along the way."  AR 49.

3        However, J. Ho, the Agency medical reviewer who completed the 2006 Request for

4    Corrective Action of Thy's initial disability determination, noted in his findings that "[t]he

5    medical evidence in the current file includes a 5/03 report from Summit Medical Center for

6    abdominal pain, which was resolved, the 9/05-10/05 notes from Asian Community Mental Health

7    Services and the 12/05 psychiatric CE for posttraumatic stress disorder."  AR 427.  Not only were

8    these documents not part of the prior file referenced by the ALJ at the hearing, but there do not

9    appear to be any documents in the current record matching that description.

10       At least one agency consultant attempted to obtain Thy's prior file, apparently without

11   success.  Dr. Lee, the non-examining psychological consultant who reviewed Thy's medical

12   records in October 2013, twice requested the prior claim file (on October 1, 2013 and October 29,

13   2013) from the SSA, noting that there "[h]as to be a prior file somewhere . . . as there is no

14   medical evidence in eView from CPD [Comparison Point Decision]."  AR 601.  However, he later

15   notes, "unable to locate a copy of decision, despite MC at IN suggesting to adopt ALJ."  AR 604.

16       Neither side persuasively shows that the ALJ's failure to secure the prior claim file, or

17   establish that it could not be secured/located, is or is not error.  While both sides agree that the

18   main legal question before the ALJ was whether Thy is *currently* disabled, the ALJ's decision did

19   not rest solely on that conclusion.  Instead, as phrased by the ALJ, he concluded that Thy "has not

20   been under a disability within the meaning of the Social Security Act since September 8, 2005, the

21   date the application was filed, or since July 1, 2013, when the State agency against determined that

22   the claimant was not disabled."  AR 15, 27.  He also relied on the fact that "the record is quite

23   benign and mostly lacking prior to June 2013."  AR 22.  In these circumstances, the ALJ's failure

24   to secure the prior claim file or establish that the prior claim file could not be secured is

25   problematic.  As plaintiff points out, in other circumstances (for example in cases of alleged

26   medical improvement), the absence of a file or the ability to reconstruct a file can carry with it

27   different consequences.  *See, e.g.*, 20 C.F.R. § 404.1579(c)(3) (if prior file cannot be located or

28   reconstructed, current medical records used to establish baseline).

On remand (as required by the errors identified below), the ALJ shall attempt to secure the prior claim file or document that it does not exist and why it does not exist.

Plaintiff also argues in her motion (but not in reply) that the ALJ had a duty to secure a psychiatric expert to testify at the hearing. Pl. Mot. at 9-10. On August 11, 2015, eight days before the hearing, counsel requested that a psychological expert also appear at the hearing to testify as to Thy's medical records and diagnoses of PTSD and Major Depressive Disorder. AR 409.[24] However, a psychological expert could not be scheduled to testify at the hearing because counsel's requests "came too late in the process." AR 51. Instead, the ALJ heard testimony from medical expert and internist Dr. Amusa, who testified, "I'm not an expert in mental health. I can only go on what's documented in the medical record with regards to [Thy's] compliance with medications." AR 59. The ALJ did state, however, "[i]f it's necessary to obtain a mental health expert, we'll do that, if I think that's necessary." AR 51. The ALJ did not ultimately determine it necessary to obtain a mental health expert.

Plaintiff does not show that the failure to secure a psychiatric expert for the hearing, given the date on which the request was made, constitutes a failure *by the ALJ* to adequately develop the record.

## II. THE ALJ'S REJECTION OF THE OPINIONS OF THY'S TREATING MEDICAL SOURCES

Thy argues that the ALJ erred by rejecting the opinions of her treating medical sources—Drs. Ma (and NP Thai), Lukaszewski, Gracer, and Afary—without clear and convincing or specific and legitimate reasons. Pl. Mot. at 4.

The Ninth Circuit distinguishes between three types of physicians that provide information about a claimant: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non examining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

---

[24] On July 21, 2015, Thy's counsel also requested the presence of an endocrinologist at the hearing, to evaluate Thy's records and provide a medical opinion regarding Thy's diagnosis of Diabetes Mellitus Type 2 and her hypoglycemia and leg edema. AR 408. Plaintiff does not argue that the lack of an endocrinologist at the hearing was reversible error.

Generally, the opinion of a treating physician is entitled to greater weight than the opinion of a non-treating physician. *Id*; 20 C.F.R. § 404.1527(d)(2). However, a treating physician's opinion "is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (citation omitted). In order to properly reject the opinion of a treating or examining doctor when it is uncontradicted by another doctor, the ALJ must state "clear and convincing reasons" for doing so. *Lester*, 81 F.3d at 830. If the treating or examining physician's opinion is contradicted by another physician, however, an ALJ may reject the treating or examining physician's opinion if she states "specific and legitimate reasons" that are supported by substantial evidence. *Id.* at 830-31.

If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the SSA considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician and the "nature and extent of the treatment relationship" between the patient and the treating physician. *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

### A. Physical Medical Source Statement from Dr. Ma and NP Thai

Thy's treating clinicians Dr. Ma and NP Thai submitted a Physical Medical Source Statement (dated respectively in June and January 2015) opining that Thy's ongoing impairments, including dizziness, fatigue, sadness, impaired sleep, depression, and anxiety, would cause her to (1) miss work more than 4 days per month, (2) take unscheduled breaks "very often," (3) be "off task" more than thirty percent of the time, (4) have "good days" and "bad days," and (5) need 4 hours of rest in an 8 hour work day. AR 784-89. Thai and Ma further opined that Thy could perform manipulative activities such as reaching, handling, and fingering occasionally, lift/carry 10 pounds occasionally and 50 pounds rarely, stand/walk about for one hour in an eight hour work day (but for no longer than 15 minutes at a time), sit for 4 hours day (but for no more than 30 minutes consecutively), climb stairs and ladders rarely, and balance, twist, stoop, crouch, and squat occasionally. AR 787-88.

Without identifying either Dr. Ma or NP Thai by name, the ALJ gave "very little weight"

to their opinions in the Medical Source Statement "because it is, brief, conclusory, and inadequately supported by clinical findings," and "the opinions of two non-examining sources, an examining source, and a medical expert are quite inconsistent with the 'less than sedentary' residual functional capacity opined by those providers." AR 22.[25] The ALJ's rejection of the findings in the Physical Medical Source Statement was not warranted.

As a threshold matter, the Ninth Circuit has held that although a nurse practitioner working alone does not constitute an acceptable medical source, a nurse practitioner working under a physician constitutes an acceptable medical source. *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996); *Taylor v. Commissioner of Social Security Administration.*, 659 F.3d 1228, 1234 (9th Cir. 2011).[26] "Critically, [the doctor's] endorsement establishes that [the nurse practitioner] worked in conjunction with a treating physician." *Green v. Colvin*, No. 13-cv-05105-WHO, 2014 WL 6066187, at *9 (N.D. Cal. Nov. 13, 2014). It appears from the record that the relationship between NP Thai and Dr. Ma (and other treating medical doctors at AMCHS) is sufficient to demonstrate the supervision necessary to deem NP Thai an "acceptable medical source," as most of Thai's appointment notes were signed/endorsed by Dr. Ma or other doctors.

Substantively, the record shows that Ma and/or Thai provided medical treatment at AMCHS from February 2014 through June 2015,[27] and their appointment notes detailing that treatment are detailed and thorough, and include information relating to Thy's current medication regimen, blood work and other labs, and current and chronic symptoms. Moreover, the findings

[25] The ALJ also appeared to take issue with the fact that "[a] nurse completed [the] form in January, which was countersigned by a medical doctor in June 2015." AR 22; *see* AR 789. As discussed in more detail below, both of these providers had a treating relationship with Thy during this time period; that Dr. Ma signed the statement at a later date does not undermine the opinions.

[26] In *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012), the Ninth Circuit preserved *Gomez's* narrow exception allowing nurse practitioners to be treated as acceptable medical sources when they work closely under the supervision of a doctor, despite the repeal of 20 C.F.R. § 416.913(a)(6), which the *Gomez* court partially relied upon and which provided that "[a] report of an interdisciplinary team that contains the evaluation and signature of an acceptable medical source is also considered acceptable medical evidence."

[27] Ma also prescribed Thy various medications as early as 2012. *See* AR 452-53 (February 2012 refill authorization request listing Dr. Ma as the prescribing clinician); AR 515, 517, 629, 631 (same, prescriptions written on May 20, 2013) AR 535, 537 (same, prescriptions written on January 2, 2013);

listed in those notes generally support their conclusions listed in the Source Statement: that Thy's chronic dizziness, fatigue caused by her uncontrolled diabetes, and depression would impose limits on her functional abilities.

While the records from AMCHS show stability for some of her conditions with medication, the ALJ apparently equated "stability" with improvement sufficient to allow work, without explaining his basis for doing so. Those same treatment notes show that Thy's conditions and symptoms fluctuated and frequently worsened. *See* AR 685-90 (February 20, 2014 comprehensive preventative medicine examination by NP Thai, noting an onset of depression on February 2012, noting her depression as "stable per CM/Dr. Tim" and directing her to continue to follow up with her providers at ACMHS); AR 695-98 (April 17, 2014 appointment with NP Thai, noting that Thy was "doing well" and "no complaint today'); AR 703 (June 23, 2014 appointment for follow-up regarding "hyperglycemia and dizziness last week"; notes taken by NP Thai and Dr. Ma); AR 704-707 (June 30, 2014 appointment with NP Thai noting uncontrolled diabetes symptoms improved);AR 712-16 (July 15, 2014 appointment for dizziness "occur[ring] daily," notes taken by NP Thai and signed by MD); AR 717-721 (August 5, 2014 appointment noting dizziness symptoms "improved and stable, cont[inue] meclizine"; notes taken by NP Thai and signed by MD); AR 722-26 (September 18, 2014 appointment with NP Thai, noting Thy "feels better now, no more dizziness, no longer needs meclizine"); AR 733-37 (November 19, 2014 appointment noting Thy's depressive disorder as stable and listing meclizine as current medication for dizziness); AR 738-43 (January 15, 2015 appointment, NP Thai notes "still depressed but stable" and lists meclizine as current medication); AR 793-98 (April 21, 2015 appointment with Dr. Ma noting Thy's chronic depressive disorder was "stable").

That the Medical Source Statement signed by Ma and Thai was "brief and conclusory" is not a valid reason to discredit it because it was based on their prior extensive treatment history with Thy. *See, e.g., Popa v. Berryhill*, No. 15-16848, 2017 WL 4160041, at *5 (9th Cir. Aug. 18, 2017) ("Simply put, the fact Dr. Sorrell, an 'other source,' provided information in a check-box form provides no reason to reject her opinions, much less a germane reason."). While the ALJ also discounted the opinion as "inadequately supported by clinical findings," the ALJ did not

1    suggest why the treatment notes from February 2014 through June 2015 were not sufficient

2    support or why those notes contradicted the January 2015 Medical Source Statement.

3         The ALJ also found the opinion of Dr. Ma and NP Thai regarding Thy's "less than

4    sedentary" RFC to be "quite inconsistent" with the "the opinions of two non-examining sources,

5    an examining source, and a medical expert are quite inconsistent with the 'less than sedentary'

6    residual functional capacity opined by those providers." AR 22. While the ALJ does not specify

7    which providers' opinions he is referring to, presumably he means Dr. Phillips (non-examining

8    source in 2013), Dr. Bradus (non-examining source in 2013), Dr. Rana (examining source in

9    2013), and Dr. Amusa (medical expert who testified at the hearing).

10        With respect to the examiners and non-examining sources from 2013, those doctors not

11   only did not have a treating relationship with Thy, they did not have the opportunity to review the

12   Ma/Thai treatment notes. With respect to Amusa (who presumably had the opportunity to review

13   the Ma/Thai treatment records and Medical Source Statement prior to the hearing), a contradictory

14   opinion about whether sedentary work was appropriate would be a valid basis to decrease the

15   weight given to Ma/Thai. But the ALJ did not identify which portions of Amusa's testimony were

16   contradictory on *this issue*.[28]

17        Additionally, if ALJ could discount Dr. Ma and NP Thai's opinion because it was "brief,

18   conclusory, and inadequately supported by clinical findings," and contradictory to the likewise

19   brief opinions provided by the non-treating examiners, it still merits special weight pursuant to the

20   factors identified in *Orn*. Dr. Ma and/or NP Thai saw Thy regularly for over a year, starting in

21   February 2014, and they were also involved in other aspects of Thy's treatment, as they

22   coordinated with Dr. Hsu, Thy's endocrinologist, who saw Thy every two to three months for

23   diabetes management from November 2008 to February 2015. *See* AR 762-76 (Dr. Hsu's

24   appointment notes from May 2014 to February 2015, cc'ing NP Thai and/or Dr. Ma).

25

26   _____

27   [28] In Opposition, the Commissioner relies on evidence from the record showing that Thy regularly
     exercised as support for the ALJ's discounting of Ma/Thai's limitations. Oppo. at 17. However, a
     "reviewing court may not make independent findings based on the evidence before the ALJ to

28   conclude that the ALJ's error was harmless" but must instead "review the reasons the ALJ
     asserts." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015).

Given this established treatment history, the ALJ improperly discounted the Ma/Thai opinion.

**B.     Opinions of Drs. Gracer and Afary**

Plaintiff also challenges the ALJ's decision to give "very little weight" to the opinions of James Gracer and Mona Afary from July and August 2015 "because they are brief, conclusory, and inadequately supported by clinical findings." AR 24.[29] Thy started receiving treatment from Gracer and Afary at CERI in June 2015, and those doctors evaluated plaintiff using different trauma and psychological evaluation tools from June through August 2015. AR 815, 816-818. They also completed a Mental Impairment Questionnaire in August 2015, confirming her diagnosis with PTSD and Dysthymic Disorder, giving her a poor prognosis, and opining that she was significantly limited in her functioning in ways that would prevent her from working. AR 819-824. It is unclear why the ALJ believed the Gracer/Afary opinions to be "brief and conclusory" given that their opinions were based not only on their intake analysis but also additional, significant psychological testing and evaluations. Prior to giving their opinion in August 2015, Gracer and/or Afary had seen Thy for five sessions. AR 819. The allegedly brief and conclusory nature of the Gracer/Afary opinions are not a valid ground on which to discount their opinions. *See, e.g., Popa v. Berryhill*, No. 15-16848, 2017 WL 4160041, at *5.

The ALJ called the Gracer and Afary opinions "wildly inconsistent" with the treatment notes from Lukaszewski that showed Thy was improving on medication and noted a steady increase in Thy's GAF from 47 in February 2014 up to 60 as of April 2015. AR 651, 790-92. However, as plaintiff points out, a GAF of 60 still indicates moderate (as opposed to mild) symptoms. Pl. Mot. at 5. There was no opinion from Lukaszewski, for example, that as a result of

---

[29] Plaintiff in passing also argues that the ALJ rejected the opinion of Dr. Lukaszewski – that Thy had moderate to marked non-exertional limitations secondary to chronic PTSD – without providing clear and convincing or specific and legitimate reasons. Pl. Mot. at 12. But plaintiff does not indicate where Lukaszewski made that opinion. Plaintiff points out that her GAF score during her treatment from February 2014 through April 2015 rose, but never exceeded 60, and argues that a GAF of 60 still indicates moderate (as opposed to mild) symptoms. AR 790-92, Pl. Mot. at 5. The ALJ actually relied on Lukaszewski's progress notes, characterizing them as generally positive and showing progress, in order to discount the later notes and opinions from James Gracer and Mona Afary. AR 23.

1    her improvement and as of April 2015, Thy was *not* limited in her ability to function or that Thy

2    could handle the requirements of regular work.

3         The ALJ concluded that Gracer and Afary relied too heavily on Thy's subjective reports of

4    symptoms and limitations and chose to ignore (or were unaware) that Thy received no mental

5    health treatment between 2006 and 2013 and that treatment notes by Lukaszewski showed

6    significant improvement.  But there is evidence from 2009 and then again in April 2012 (and well

7    prior to the June/July 2013 notification by the SSA that Thy might lose her benefits) that Thy was

8    receiving psychotropic medication from her primary care physician, although there is no evidence

9    that she was seeing a psychiatrist during this time. AR 465 (identifying fluoxetine prescriptions

10   from April through August 2012); AR 514 (identifying fluoxetine prescriptions from May 2013

11   through September 2013); AR 540 (identifying fluoxetine prescriptions from December 2012

12   through March 2013); *see* AR 933 (January 28, 2009 AHS progress note noting Thy's depression

13   medication changed from Lexapro to Fluoxetine "for formulary reasons").  And as noted above,

14   while Thy improved during her treatment with Lukaszewski (at the same time she was receiving

15   therapy twice a month and case management services from Prum and Meas-Powell), there is no

16   analysis that her PTSD or major depression had stabilized as of April 2015 *at a level* that allowed

17   her to work or did not severely impair her daily life functioning.

18        The ALJ also believed Gracer and Afary ignored, or were unaware of, inconsistencies

19   between Thy's allegations and her functional abilities.  He never identified any functional abilities

20   that were contrary to the Gracer and Afary opinions.[30]  He also asserted that Gracer and Afary

21   should not have relied on Thy's subjective statements because Thy had significant credibility

22   issues.  Specifically, the ALJ discounted Thy's credibility because she only sought mental health

23   treatment in or just after June 2013, when the SSA questioned whether she was currently disabled

24   and because the source of claimant's alleged trauma shifted from the rape to her childhood

25   _____

26   [30] The ALJ did not actually identify Thy's "actual" functional abilities that undermined her
     reported limitations, but presumably the ALJ meant his prior recognition that plaintiff could

27   independently perform her own grooming, feed herself and prepare simple meals, engage in some
     limited household chores over an extended period of time, shop for groceries, and take the bus.

28   AR 18; *see also* AR 72-75 (hearing transcript).

experiences in Cambodia only when she began seeing Gracer and Afary and "shortly before" the ALJ hearing. AR 22, 24. Neither reason for discounting her credibility is accurate. As discussed earlier, Thy sought mental health treatment in 2005 through 2006, and was being prescribed psychotropic medication by her primary care physician well before June 2013. *See, e.g.*, AR 933, 935, 937, 939 (2009), AR 465 (April through August 2012); AR 514 (May 2013 through September 2013); AR 540 (December 2012 through March 2013); *see also* AR 891 (change from Paxil to Zoloft in 2005). And there is evidence that at least since July 2013 (and not shortly before the hearing as characterized by the ALJ), that she identified the traumatic events from her childhood in Cambodia as a source of her current mental health issues. AR 635 (July 2013).

In sum, the ALJ made numerous factual misstatements as support for discounting the Gracer and Afary opinions.

## III. THE ALJ ERRED BY DISCREDITING THY'S STATEMENTS CONCERNING THE INTENSITY, PERSISTENCE, AND LIMITING EFFECTS OF HER SYMPTOMS

The ALJ must engage in a two-step analysis when evaluating a claimant's credibility. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). First, the ALJ determines "whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 1036 (internal quotations omitted). Second, if the claimant has met the first step and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (internal quotations omitted); *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014); *Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014). An ALJ must "specifically identify what testimony is credible and what testimony undermines claimant's complaints." *Morgan*, 169 F.3d at 599.

The ALJ may consider many factors when weighing credibility, including "reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (internal quotations omitted). An ALJ's assessment of a claimant's credibility and pain severity is entitled to great weight. *See*

*Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989).

Here, the ALJ concluded that there "is ample reason to find the claimant not entirely credible, as discussed herein." AR 24. "Foremost" of these reasons is that Thy "apparently sought no mental health treatment until after the SSA initiated proceedings in 2013," even though the source of her trauma was "a rape that allegedly occurred in 2000, or 2001, or 2002, or 2003." AR 24. However, as discussed above, that is not accurate.

Second, the ALJ found it suspicious that Thy saw CERI psychologists Gracer and Afary only "shortly before the hearing," and that "the focus suddenly shifted to the history of the Khmer Rouge and the 'killing fields.'" AR 24. Again, that is not accurate.

Third, the ALJ asserted that there are "many inconsistencies between the claimant's allegations and her actual functional abilities." AR 24. However, those alleged functional abilities were never specifically identified.

Fourth, the ALJ relied on the fact that Thy's "earnings history shows that the claimant worked only sporadically since she reached adulthood, which raises a question as to whether her continuing unemployment is actually due to medical impairments." AR 25. But that, standing along, is not clear and convincing evidence sufficient to discredit her testimony.

Finally, the ALJ questioned Thy's alleged limited English proficiency, finding it "doubtful that the claimant does not have some capacity to communicate in English" because she "has at least a high school education and is able to communicate in English to some undisclosed degree." AR 25.[31] However, there is no evidence that Thy contends she cannot comprehend *some* English. Instead, her consistent position in the record is that she is not fluent, and has consistently relied on Cambodian interpreters at her appointments,

_____

[31] ALJ Laverdure also noted that ALJ McCarrick, in denying Thy's 1993 claim, apparently found that she lacked credibility because she misrepresented her alleged inability to speak, read, and write English. *See* AR 14. He also noted that the Quality Assurance reviewer made the same finding in 2006, that Thy's credibility was doubtful because she still alleged an inability to speak, read and write English. AR 13, 427. However, because of the lack of records from those claim files, including the lack of ALJ McCarrick's *actual* opinion, ALJ Laverdure cannot simply incorporate those alleged prior conclusions as a basis for his determination as to Thy's credibility as of 2013.

1    evaluations, and at the ALJ hearing.  AR 487, 640, 653, 792, 799.

2         Given my conclusions concerning the errors made by the ALJ with respect to the

3    discrediting of Thy's treating sources and the treatment of her credibility, I need not reach

4    the additional errors asserted with respect to the ALJ's RFC determination and use of an

5    allegedly incomplete hypothetical.

6    **IV.    REMAND FOR FURTHER PROCEEDINGS**

7         Plaintiff argues that in light of the errors made by the ALJ here, remand for an award of

8    benefits is warranted.  When reviewing courts find that an ALJ has erred, they typically follow the

9    "ordinary remand rule," which states that courts should remand to the agency for additional

10   proceedings where "the record before the agency does not support the agency action, . . . the

11   agency has not considered all relevant factors, or . . . the reviewing court simply cannot evaluate

12   the challenged agency action on the basis of the record before it."  *Treichler v. Comm'r of Soc.*

13   *Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).  However, courts may depart from this practice

14   in "rare circumstances."  *Id*.

15        The Ninth Circuit has articulated a three-part standard for determining when departures

16   from the ordinary remand rule are appropriate.  Courts may remand to an ALJ with instructions to

17   award benefits when the following requirements are satisfied:  "(1) the record has been fully

18   developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has

19   failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or

20   medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ

21   would be required to find the claimant disabled on remand."  *Garrison v. Colvin*, 759 F.3d 995,

22   1020 (9th Cir. 2014); *see also Treichler*, 775 F.3d at 1101.  No further proceedings are necessary

23   where "it is clear from the record that a claimant is entitled to benefits" and "the record has been

24   developed fully and further administrative proceedings would serve no useful purpose."  *Garrison*,

25   759 F.3d at 1019; *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).

26        While plaintiff asks me to remand this case for an award of benefits, as opposed to

27   further proceedings consistent with this opinion, I decline to do so.  I am not convinced

28   that further development of the record – including the testimony of a psychiatric expert and

1    a determination of whether the records from Thy prior claims can be located – would serve

2    no useful purpose.[32]

3                                **CONCLUSION**

4          For the foregoing reasons, plaintiff's motion for summary judgment is GRANTED, the

5    Commissioner's motion for summary judgment is DENIED, and this case is remanded for further

6    proceedings consistent with this opinion.

7          **IT IS SO ORDERED.**

8    Dated: September 28, 2017

9

10                                              _____

11                                              William H. Orrick
                                             United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

---

27    [32] Plaintiff's alternative request, for remand for further proceedings before a different ALJ based on potential bias of the ALJ and under the authority of 20 C.F.R. § 404.940, is DENIED.  If this

28    case is reassigned to ALJ Laverdure on remand, plaintiff may object under the procedures of § 404.940.